THE STATE OF NEBRASKA, EX REL., BRUNO TZSCHUCK V. JEFFERSON B. WESTON, AUDITOR.

1. Constitutional Law: EXECUTIVE OFFICERS: ADJUTANT GENERAL. The office of adjutant general exists in this state by virtue of an appointment from the Governor as commander-in-chief of the military forces, acting under authority given him by Congress (1 Statutes at Large, 273), and the act of March 4, 1870. *Gen. Stat.*, 470.

2. ———: ———: ———. Such an office is not executive within the meaning of the constitution which provides that "no other executive state office (aside from those mentioned), shall be continued or created."

3. ———: ———: SECRETARY OF STATE: SALARY. One holding the office of secretary of state is eligible to that of adjutant general, and the allowance to him of a salary therefor, does not conflict with that section of the constitution, fixing the salary of the secretary of state, and providing that he shall not receive to his own use "any fees, costs, perquisites of office, or other compensation."

ORIGINAL application for Mandamus. It set forth that the relator had, on the first day of February, 1875, been duly appointed, commissioned and qualified as adjutant general of the state, by his excellency Silas Garber, Governor, and that he had ever since performed the duties of that office and was fully entitled to the emoluments thereof; that the legislature at its session in 1873, appropriated the sum of four hundred and fifty dollars per annum as the salary of the adjutant general; that he had drawn such salary up to the first day of November, 1875, but since that date the auditor of state had refused to draw his warrants for the further payment of such salary. The answer of the respondent, denied that there

was any such office as adjutant general in this state since the first day of November, 1875; and that anything was due the relator as adjutant general since that date. It alleged that the present constitution taking effect November 1, 1875, abolished and discontinued that office, if any such office before existed; that the relator was secretary of state receiving a fixed salary, and as such officer prohibited from receiving any salary or emoluments for or on account of any other office.

*N. S. Harwood*, for the relator.

I.  Does the office of adjutant general exist in this state?  That point being established, the only remaining question will be, can the relator, under our new constitution, hold the office and draw the pay?  We contend that the office is in existence in this state from the following facts, viz:  The act of Congress of 1792, and acts supplementary thereto, requires each state to have an adjutant general.

1.  These acts are in full force, constitutional, and mandatory on the states.  Nor do we find them to have been questioned by the courts.  This is necessary to enforce the war power of the general government.

2.  The state has recognized the force of this law by its militia act, which requires its independent companies to report to the adjutant general, and gives the governor power to make all necessary appointments to carry out the provisions of such act.  *Gen. Stat.*, 470.  The adjutant general is one of the officers required under this act. It is impossible to draw the state quota of arms without such officer or organize the militia.  Therefore in pursuance of said act, and the acts of Congress, the governor appointed the relator to this office, and the legislature thereafter ratified the appointment by making an appropriation to cover his salary $450 per annum.  Can it need

any stronger proof of the existence of the office than this?

II.   The existence of the office under the permanent authority of congress, and acquiescence of this state, being established, can the relator hold the office?

1.   The relator is secretary of state.   Sec. 24, article V, of the new constitution, provides the salaries of the various state officers, and that " they shall receive no other fees or perquisites of office, and that all fees shall be paid in advance into the state treasury."   This relates to the fees of the officer, and no more relates to his salary as adjutant general, than it would to fees he might receive as a notary public or commissioner of deeds, if he should chance to hold those offices.   As well might it be contended that the profits of his farm should be converted into the state treasury, as that his salary should be.

2.   The office is not an *executive* office, within the meaning of the constitution.   It is in the nature of a staff office.   An adjutant never holds a command; he simply acts as the clerk or agent of an executive officer.

3.   The relator doubtless could not be compelled to perform the duties of this office, but having done so he is entitled to the pay.   *Love v. Baehr*, 47 *Cal.*, 364. *Crosman v. Nightingill*, 1 *Nev.*, 326.   *Converse v. United States*, 21 *How.*, 463.

*George H. Roberts, Attorney General*, for the respondent.

I.   It is not denied that his excellency, the governor, has duly appointed the relator to the office, so-called, of adjutant general, but it is contended that under the act of March 17, 1871, *General Statutes*, 1020, said office was abolished, and since that time no authority has existed to fill the office.   And by this same act abolishing the office, the books and papers are to be kept and

preserved by the secretary of state. So then, under this act, the taking care of these records was made part of the duties of the secretary, as secretary, and was so designated by law; and under this act, as well as under the general law prescribing the duties of secretary of state, it became, was, and still is the duty of the relator, as such secretary, to take charge of and care for these records, and without additional compensation.

II. Can it be claimed, that the appropriation for salary as adjutant general re-created that office? Can it be claimed that it exists under an old and musty act of Congress, without any assisting legislation of the state? This appropriation, when made, was only the result of an effort in behalf of the people, to make other and further provisions for their then niggardly paid public servants, if not over, then around. the provisions of the old constitution, which fixed the salary of the secretary at the paltry sum of six hundred dollars per annum. But the reason of this appropriation is now happily remedied, by the adoption of the present constitution, to some of the provisions of which we invite the attention of the court.

III. It certainly seems as if we might pause by merely citing Sec. 24, article V, which provides that the officers mentioned shall receive "no other compensation," satisfied that if the court could not agree with us in the propositions above laid down, it would do so in our construction of this section, the salary of the secretary, in which, as we claim is in full compensation for the performance of all the duties devolved upon him, including the care and custody of the records of the former adjutant general. But by section twenty-six of the same article, there is an express inhibition that no other executive state office shall be continued or created,

except those named in the constitution, among which is not to be found the name of the adjutant general.

IV.  We contend then:  *First.*  We had no such office under the old constitution.  *Second.*  If we had, it was discontinued because not provided for by the new.  *Third.*  The books and records are in charge of the secretary of state.  *Fourth.*  We find the provision that duties devolving upon officers not provided for by this constitution shall be performed by the officers herein created.  *Fifth.*  We find the secretary of state performing the duties of an adjutant general.  *Sixth.*  The constitution fixes the salary of secretary of state at $2,000, and denies him any other compensation whatsoever.

V.  But the relator who, as is admitted, fills the office of secretary of state, is ineligible to " any other state office," under the provisions of section two of the Executive Article.  And if the office of adjutant general does exist, which any other person might fill, and draw the salary appropriated, still the relator is ineligible under the last named section of the constitution, which clearly provides that " none of the officers of the executive department shall be eligible to any other state office during the period for which they shall have been elected."  The relator is not then entitled to the relief prayed for, and the writ should be denied.

*N. S. Harwood,* in reply.

I.  We have proved the existence of the office independent of the act of 1869, creating it and the act of 1871, abolishing it.  Therefore the act of the legislature did not create a thing already in existence, consequently it could not abolish it.  It did, however, by the first named act fix the salary, and make it the duty of the governor to appoint.  The last did, and only could abol-

ish the salary and leave it to the governor to appoint or not, as he saw fit. But this act in no wise repealed the militia act of 1870.

II. Section two of Article V, which provides that "none of the executive officers shall be eligible to any other state office, during the period for which they have been elected," if it applies at all to this office, is held in check until the expiration of the present term by section five of the schedule, which provides that "all persons now filling any office or appointment, shall continue in the exercise of the duties thereof according to their respective commissions, elections or appointments," unless otherwise directed by the constitution, which in this case it is not. The relator's commission does not expire until January, 1877.

LAKE, CH. J.

This is a proceeding by mandamus to compel the defendant who is auditor of state, to draw his warrant upon the state treasurer, in favor of the relator in payment of his salary as adjutant general of the state. The answer to the alternative writ raises several questions for our consideration which we will briefly notice.

I. Is the relator the officer which he claims to be? That he was, at least formally appointed to said office on the 1st day of February, 1875, is not disputed. But it is contended on behalf of the defendant, first: That the governor had no authority to make the appointment; and second: That even if the authority to make it be conceded, yet the new constitution, of its own force, terminated the office on the first day of November last, and third: If this last proposition be untrue, then it is insisted, that the relator, who was duly elected to, and holds the office of secretary of state, with a fixed salary of $2,000 per annum, is, by the constitution, debarred the privilege of receiving any other or further compensation whatever

from the state, although he may have performed all the duties of the office of adjutant general also.   We will notice these objections in the above order.

By an act of the legislature, approved February 15, 1869, the governor was required to appoint and commission an adjutant general for the state, who was required by said act to reside at the seat of government, keep his office open for the transaction of business every day, Sundays excepted, and was to receive for his services a salary of $1,000 per annum.   This act was repealed on the seventeenth day of March, 1871.   By the second section of this repealing act it was provided, that " the books, papers, and property of the state, in the hands of the adjutant general, shall be taken possession of by the secretary of state, and by him preserved."

By this act it will be observed that the secretary of state was simply made the custodian of the books, papers, and property of the state then in the hands of the adjutant general.   He was invested with none of the powers, nor required to perform any of the numerous duties, usually devolving upon an adjutant general.

But at the time of the repeal of the act of February 15, 1869, the act of March 4, 1870, providing for the organization of state troops, and for other purposes, was in full force.   Following the provision of the constitution, in this particular, section five of this act provides, that " the governor shall be commander-in-chief of the militia, and volunteer troops of the state, and he shall arm and equip the same when in his judgment he shall deem it necessary for the protection of the citizens thereof, *so as to conform to the laws and regulations of the United States army*," etc.

Now to do all this it is absolutely necessary that there should be certain officers to perform the various duties contemplated by this act, one of the most important of which, in view of the relation which the military organi-

zation of the state holds to the general government, is the adjutant general.

By section six of the Act of Congress entitled, "An Act more effectually to provide for the National Defense by establishing an uniform militia throughout the United States," approved May 8, 1792, it is provided, "That there shall be an adjutant general appointed in each state, whose duty it shall be to distribute all orders from the commander-in-chief of the state to the several corps; to attend all public reviews when the commander-in-chief of the state shall review the militia, or any part thereof; to obey all orders from him relative to carrying into execution and perfecting the system of military discipline established by this act; to furnish blank forms of different returns that may be required, and to explain the principles on which they should be made; to receive from the several officers of the different corps throughout the state, returns of the militia under their command, reporting the actual situation of their arms, accoutrements and ammunition, their delinquencies, and every other thing which relates to the general advancement of good order and discipline; all of which the several officers of the divisions, brigades, regiments, and battalions, are hereby required to make in the usual manner, so that the said adjutant general may be duly furnished therewith; from all which returns he shall make proper abstracts, and lay the same annually before the commander-in-chief of the state." 1 *U. S. Statutes at Large*, 273.

Now it is quite clear that this act of Congress contemplates, nay requires, affirmative action at the hands of the proper authorities. Indeed, it directs the performance of a plain duty, which a due regard for the public safety requires should not be omitted.

And it would seem that the legislature must have had this duty in view, in the passage of the act of the fourth

of March, 1870, before referred to, by which at least the skeleton of a state military organization is provided for.

As to the office of adjutant general, it was undoubtedly intended by the legislature that it, as well as all other usual and necessary staff offices, required for the efficient organization of the militia, should be left just where they usually are, viz: in the hands of the commander-in-chief, for, by section six of said last named act, it is provided that "the governor shall appoint, except where elected as hereinbefore provided, and commission all officers."

Giving, therefore, to this act of Congress, and to that of our own legislature on this subject, the effect which it was evidently intended they should have, it seems very clear to us, that the governor had full authority to make the appointment in question, and that the relator was entitled, under the law, to the compensation which the legislature had provided.

II. But, it being established that the relator was rightfully in the possession of the office, and well entitled to the emoluments thereof, at the time our present constitution took effect, how stands the matter now? Is there anything in the instrument from which it can reasonably be inferred, either, that the office is destroyed, the relator rendered ineligible, or the legislative appropriation for his salary changed, or modified, in any respect?

It was claimed on behalf of the defendant that the office ceased to exist on the first day of November last, when the new constitution took effect. This claim is based upon sections one and twenty-six, article V, of the constitution. Section one, among other things, provides that "the executive department shall consist of a governor, lieutenant governor, secretary of state, auditor of public accounts, treasurer, superintendent of public

instruction, attorney general, and commissioner of public lands and buildings.". And section twenty-six, "that no other executive state office shall be continued or created, and the duties devolving upon officers, not provided for, by this constitution, shall be performed by the officers herein created." This last section doubtless refers solely to executive state officers, and to civil duties, strictly executive. We do not think it has any reference whatever to the officers necessary to the perfection of a military organization under our National and State laws. 'Nor do we see any reason why the person who happens to hold the office of secretary of state, may not, at the same time, hold that of adjutant general. It is true, that the duties of the two offices are entirely dissimilar, but they are in no respect antagonistic, and, so long as the incumbent is willing to undertake the performance of both, in the absence of a law prohibiting it, we are of the opinion he may do so. We do not think that the office of adjutant general is an executive office within the meaning, nor does it fall within the operation of the sections of the constitution before cited.

III. But, conceding that he may hold the office, and perform the duties thereof, can he receive the compensation which the legislature has provided? The defendant insists that he is restricted by the constitution solely to his salary as secretary of state.

It is doubtless true, that, as to all duties, which, as secretary of state, he is now, or may hereafter be required to perform, he is absolutely restricted to the salary provided in the constitution. But we do not think this restriction goes to the extent claimed for it. It is found in section twenty-four, article V, which fixes the salaries of the several executive state officers, and, among other things provides, that the officers therein mentioned, " shall not receive to their own use, any fees, costs, inter-

est upon public moneys in their hands, or under their control, perquisites of office, *or other compensation,*" etc.

As before stated, this would undoubtedly apply to all acts or duties, required of the relator as secretary of state, and as to such acts and duties, he is confined to his salary of $2000 per annum, for his compensation. But the duties imposed upon him as adjutant general are in no sense of a civil character, but purely military. Under the act of Congress before referred to, it is made his duty " to distribute all orders from the commander-in-chief of the state to the several corps; to attend all public reviews, when the commander-in-chief shall review the militia, or any part thereof; to obey all orders from him relative to carrying into execution and perfecting the system of military discipline established by this act," duties in no sense pertaining or relating to the office of secretary of state, and not imposed upon him as such officer.

Such being the case, we see no reason why the relator is not entitled to whatever compensation, as adjutant general, the legislature may see fit to bestow upon him, in addition to his salary as secretary of state. *Love v. Baehr*, 47 *California*, 364.

THE PEREMPTORY WRIT IS AWARDED.

All the judges concurred.