STATE OF NEBRASKA, EX REL. O. HORNE, V. SILAS A.
HOLCOMB, GOVERNOR.

FILED OCTOBER 3, 1895.   No. 7769.

1. **Constitutional Law**: CONTEMPORANEOUS CONSTRUCTION.   A
   contemporaneous construction of a constitutional provision,
   which has for many years been adhered to by the legislative and
   executive departments of the government, will not be disre-
   garded by the courts, and in doubtful cases will generally be
   held conclusive.

2. **Trustees for Institution for the Blind**: ELECTION BY
   LEGISLATURE: CONSTITUTIONAL LAW.   Session Laws, 1875, p.
   150, sec. 2, providing for the election by the legislature of trus-
   tees for the institution for the blind, is repugnant to section 10,
   article 5, of the constitution, and was thereby repealed.

ORIGINAL application for *mandamus* to compel the governor to approve the bond of relator as treasurer of the board of trustees of the institution for the blind at Nebraska City.   *Writ denied.*

*John C. Watson* and *S. G. Hutchinson,* for relator, cited: *State v. Bacon,* 6 Neb., 286; *Curtis v. Allen,* 43 Neb., 184; *State v. Plambeck,* 36 Neb., 401; *Beck v. Jackson,* 43 Mo., 117; Cooley, Constitutional Limitations, 184; *Pleuler v. State,* 11 Neb., 547; *State v. Smith,* 35 Neb., 24; *People v. Morgan,* 90 Ill., 558; *Wilcox v. People,* 90 Ill., 186.

*Darnall & Kirkpatrick, contra,* cited: *State v. Kennon,* 7 O. St., 566; *People v. Loewenthal,* 93 Ill., 196; *Jackson v. Board of Supervisors of Washington County,* 34 Neb., 680; *Coutant v. People,* 11 Wend. [N. Y.], 511; *State v. Bacon,* 6 Neb., 286; *Clark v. Stanley,* 66 N. Car., 59; *People v. McKee,* 68 N. Car., 429; *People v. McGowan,* 68 N. Car., 520; *Bunn v. People,* 45 Ill., 410; *State v. Hyde,* 22 N. E. Rep. [Ind.], 644; *State v. Peele,* 22 N. E. Rep. [Ind.], 654; *State v. Denny,* 21 N. E. Rep. [Ind.], 252; *State v. Board of Public Lands & Buildings,* 7 Neb., 42; *In re Board of Public Lands & Buildings,* 18 Neb., 340.

POST, J.

This is an application to this court in the exercise of its original jurisdiction for a writ of *mandamus,* requiring the respondent, as governor, to approve the relator's bond as treasurer of the board of trustees of the institution for the blind at Nebraska City.   It appears from the pleadings upon which the cause is submitted that the legislature, on the 5th day of April, 1895, elected trustees for the institution above named as follows : Webster Eaton and F. E. McKeeby, to serve until March 4, 1897; and J. L. Fisk and D. W. Crane, to serve until March 4, 1899; and W. L. Wilson and the relator, O. Horne, to serve until March 4,

1901.   The relator, having been named as treasurer for the board so chosen, presented for approval his official bond which is conceded to be in all respects sufficient, but the respondent refuses, for reasons hereafter appearing, to approve said bond, or to take any action whatever with respect thereto.   The relator's claim is founded upon the provisions of sections 2 and 10 of the act of February 19, 1875, entitled "An act to erect and maintain an institution for the blind," as follows:

"Sec. 2.   Such institution shall be under the supervision of a board of trustees, consisting of six persons, who shall be elected by the legislature of the state in joint convention as soon as practicable after the passage of this act. Two of said trustees shall be elected and serve until the fourth of March, A. D. 1877, and two shall be elected to serve until the fourth of March, A. D. 1879, and two shall be elected to serve until the fourth of March, A. D. 1881, and thereafter said trustees shall be elected by joint convention of the legislature and hold their office for six years."

"Sec. 10.   The board of trustees shall elect one of their number president and another treasurer of the institution, and the treasurer shall enter into bonds with security in the sum of not less than ten thousand dollars, to be approved by the governor and auditor of state, conditioned for the faithful performance of his duties and the honest disbursement of, and accountal for, all moneys belonging to the institution which may come into his hands, which bond shall be filed with the secretary of state."

Section 23 of an act approved February 28, 1881, entitled "An act concerning official bonds and oaths," contains a provision expressly repealing section 10 above quoted, although that act is by both parties treated as void in so far as it relates to the subject of this proceeding, on the ground that the repealing clause thereof is not germane to the title.   It is unnecessary in this connection to determine the

effect of the attempted repeal, since we prefer to rest our conclusions upon other and more satisfactory grounds.

A question distinctly presented by this record, and which must be regarded as decisive of the controversy, is whether section 2 of the act of 1875 was abrogated by the provisions of section 10, article 5, of the constitution of 1875, which took effect November 1 of that year, and which reads as follows:

"Sec. 10. The governor shall nominate and by and with the advice and consent of the senate (expressed by a majority of all the senators elected, voting by yeas and nays) appoint all officers whose offices are established by this constitution, or which may be created by law, and whose appointment or election is not otherwise by law or herein provided for; and no such officer shall be appointed or elected by the legislature."

These provisions of the constitution, it must be confessed, are wanting in the clearness and precision which characterizes that instrument as a whole. However, a careful analysis of the above section discloses that power is thereby conferred upon the governor to appoint two classes of officers, viz., (1) those whose offices are established by the constitution itself, and (2) those whose offices are created by law and whose appointment or election is not otherwise provided for. The phrase, " whose appointment or election is not otherwise * * * provided for," is an apparent limitation upon the preceding general language, and read by itself impliedly authorizes the legislature to prescribe the manner of selecting all officers of its own creation. The words "by law or herein" add nothing to the force or effect of the provision, since the only officers known to our system are those established by the constitution, and such as are created by law in harmony therewith ; but the last clause of the section is in the nature of a proviso, in turn limiting the power of the legislature over the subject, and upon the scope and effect of that limitation must our con-

struction depend. The word "such" therein was not used inadvertently, and without doubt refers to one or both of the classes of officers contemplated by the first clause of the section. It cannot, it would seem, refer to the first class, since the governor is, as we have seen, expressly authorized to appoint all constitutional officers, and which authority is an obvious limitation upon the power of the legislature. It must, therefore, apply to offices created by law, and be construed as expressly prohibiting the appointment or election of officers by the legislature.

There are other considerations which should be mentioned, and which furnish the most satisfactory reasons for the conclusion above stated, some of which will be briefly noticed. It is a notorious fact, well authenticated by history and the public records of the state, that the practice of the legislature under the former constitution in appointing officers and members of boards charged with the government and control of public institutions had resulted in great abuse and public scandal, and that the constitutional restriction under consideration was designed as a remedy for that evil.

Our conclusion is also strongly supported by contemporaneous constructions of the executive and legislative departments of the government. As illustrative of the foregoing proposition may be mentioned the fact that upon the adoption of the present constitution the executive officers of the state assumed control of the public institutions, including the institution for the blind, the trustees thereof, who held by appointment of the legislature, voluntarily retiring; and at no time thereafter, until the year 1895, has the legislature assumed the power to appoint or elect officers not essential to the business of its own department. In more than one instance has the legislature determined the question at issue adversely to the claim now urged in its behalf. For instance, during the session of 1893 a communication was by the governor addressed to the com-

mittee in charge of House Roll No. 81, being a bill for "An act for the issuing of state bonds for the purpose of providing supplies for citizens suffering from loss of crops," etc., calling attention to the fact that said measure was in conflict with the constitution by reason of a provision naming commissioners to distribute the proceeds of the bonds thereby authorized. Thereupon, on motion of the distinguished attorney for the relator, then a member of the house, the objectionable provision was stricken out and the bill so amended as to authorize the appointment by the governor of the proposed commission, and in which form it subsequently became a law. To pursue the subject in this connection would be without profit, since none will controvert the proposition that this section of the constitution was understood by its framers and the people by whom it was ratified as an express limitation upon the power of the legislature, and that the popular construction thereof was by all departments of the state government adhered to without question for more than nineteen years. Such a practical exposition, if not indeed conclusive, should at this late day be accorded the highest consideration by the courts in giving effect to its provision involved. It is said by Marcy, J., in *People v. Green*, 2 Wend. [N. Y.], 274: " Great deference is certainly due to a legislative exposition of a constitutional provision, and especially when it is made almost contemporaneously with such provision, and may be supposed to result from the same views of policy and modes of reasoning which prevailed among the framers of the instrument expounded." And in a recent work on the subject it is said: "A construction of a constitution, if nearly contemporaneous with its adoption, and followed and acquiesced in for a long period of years afterwards, is never to be lightly disregarded, and is often conclusive." (Sutherland, Constitutional & Statutory Construction, 307. See, also, Endlich, Interpretation of Statutes, 357, *et seq.;* Sedgwick, Construction of Statutory & Constitutional Law,

552; *Scanlan v. Childs,* 33 Wis., 663; *Cohens v. Virginia,*
6 Wheat. [U. S.], 265; *Packard v. Richardson,* 17 Mass.,
143; *Opinion of Judges,* 126 Mass., 551; *Chesnut v. Shane,*
16 O., 599; *Jackson v. Washington County,* 34 Neb., 680;
*State v. Smith,* 35 Neb., 13; *United States v. Union P. R.
Co.,* 148 U. S., 562.) But we are fortunately not without
adjudications in point. In *State v. Stanley,* 66 N. Car.,
59, a statute authorizing the appointment of certain public
officers by the speaker of the house of representatives and
president of the senate was held to have been abrogated by
the constitution of that state which provides: "The gov-
ernor shall nominate and by and with the advice and con-
sent of a majority of the senators elect, appoint, all officers
whose offices are established by this constitution, or which
shall be created by law, and whose appointments are not
otherwise provided for; and no such officer shall be ap-
pointed or elected by the general assembly." (Constitution,
N. Car., sec. 10, art. 3.) We are unable to perceive wherein
the foregoing differs essentially from the provision of our
constitution above quoted. Indeed, the only difference
observable is the use in ours of the words "by law or
herein," which, as we have seen, add nothing to the force
of the section in which they are employed. The court in
the case cited say, referring to the last clause of the section
quoted, that the words thereof " are superadded as an ex-
press veto upon the power of the general assembly to ap-
point or to elect an officer, whether the office is established
by the constitution or shall be created by an act of the
general assembly." To the same effect see *People v. Mc-
Kee,* 68 N. Car., 429, and *People v. McGowan,* 68 N. Car.,
520. It follows that section 2 of the act of 1875, au-
thorizing the election by the legislature of trustees for the
institution for the blind, is repugnant to the present consti-
tution and was thereby repealed. The writ is accordingly

DENIED.

NORVAL, C. J., concurs.

HARRISON, J., dissenting.

This is an original application to this court praying that a writ of *mandamus* issue, directing the Hon. Silas A. Holcomb, as governor of this state, to approve the bond of the relator, O. Horne, as treasurer of the institution for the blind at Nebraska City. The complaint or petition of the relator is as follows:

"Your relator complains and alleges for that the respondent herein, the Hon. Silas A. Holcomb, is now, and since the 3d day of January, 1895, has been, the duly elected, qualified, and acting governor of the state of Nebraska; that the relator herein is a citizen and resident of the county of Otoe and state of Nebraska.

"Your relator further alleges that on the 19th day of February, 1875, there was approved an act of the legislature of the state of Nebraska entitled 'An act to erect and maintain an institution for the blind,' the second section of which act is as follows:

"'Sec. 2. Such institution shall be under the supervision of a board of trustees consisting of six persons, who shall be elected by the legislature of the state in joint convention as soon as practicable after the passage of this act. Two of said trustees shall be elected to serve until the fourth of March, A. D. 1877, and two shall be elected to serve until the fourth of March, A. D. 1879, and two shall be elected to serve until the fourth of March, A. D. 1881, and thereafter said trustees shall be elected by joint convention of the legislature and hold their office for six years.'

"Your relator further alleges that the term of office of each member of the board of trustees of said institution for the blind, heretofore elected, having expired and there being a vacancy in each membership of said board of trustees, the legislature of the state of Nebraska, in pursuance of the provisions of said act approved as aforesaid, during a regular session thereof at the capitol in the city of

Lincoln, met in joint convention on the 5th day of April, A. D. 1895, and proceeded according to law to elect a board of trustees for said institution for the blind, consisting of six persons, who were elected to serve as follows: W. L. Wilson and O. Horne, of Otoe county, to serve until March 4, 1901; J. L. Fisk, of Gage, and D. W. Crane, of Keith, to serve until March 4, 1899; Webster Eaton, of Lancaster, and F. E. McKeeby, of Webster, to serve until March 4, 1897. A copy of the certificate of the election of the relator herein is hereto attached, and marked 'Exhibit A.'

"Your relator further alleges that each person so elected as one of the trustees for said institution for the blind as aforesaid took the oath of office and qualified according to law, and each entered upon the discharge of his duties; that the said above named W. L. Wilson, O. Horne, J. L. Fisk, D. W. Crane, Webster Eaton, and F. E. McKeeby, trustees of said institution for the blind, elected as such on the 5th day of April, A. D. 1895, by the legislature of the state of Nebraska in joint convention assembled, are the sole and only trustees that have been elected by said legislature; that no other person or persons have been named, appointed, or elected as trustees of said institution other than the persons named above, and that no other person or persons are claiming to act for or represent said institution or discharge the duties as trustees of said institution; that at a regular meeting of said board of trustees for the institution for the blind held at said institution in the city of Nebraska City, Nebraska, on the 15th day of April, 1895, said board of trustees elected W. L. Wilson, one of their number, as president, and thereupon elected O. Horne, also from among and one of their number, as treasurer of said institution for the blind, which said election was done and held in pursuance of said act above referred to, the tenth section of which is as follows:

"'Sec. 10. The board of trustees shall elect one of their

number president, and another treasurer of the institution, and the treasurer shall enter into bonds with security in the sum of not less than ten thousand dollars, to be approved by the governor and auditor of state, conditioned for the faithful performance of his duties and the honest disbursement of, and accountal for, all moneys belonging to the institution which may come into his hands, which bond shall be filed with the secretary of state.'

"Certificate attached, marked 'Exhibit C.'

"Your relator further alleges that in accordance with the requirements of said act approved as aforesaid he entered into bonds as the duly elected treasurer of said institution for the blind, with security in the sum of fifteen thousand dollars, conditioned for the faithful performance of his duties, and the honest disbursement of, and accountal for, all moneys belonging to said institution which may come into his hands, which bond he presented to his excellency Silas A. Holcomb, governor of the state of Nebraska, being the respondent herein, that he approve said bond as required by said act, but your relator here makes known to this honorable court that his excellency the said Silas A. Holcomb, governor as aforesaid, refused, and still refuses, to approve said bond; that his excellency the said Silas A. Holcomb, governor as aforesaid, informed the relator herein that he was satisfied with the amount of said bond and the sufficiency of the sureties thereon, but that the legislature of the state of Nebraska had not the power or authority under said act to elect said board of trustees for the institution for the blind aforesaid. A copy of said bond is hereto attached, marked 'Exhibit B.'"

To which the respondent filed the following answer:

"Now comes the respondent, and for answer to the petition of relator filed herein admits that he is the duly qualified and acting governor of the state, and that the relator is a citizen and resident therein. Respondent further answering admits the enacting and approval of an act entitled

'An act to erect and maintain an institution for the blind,' as mentioned in relator's petition, but respondent alleges that after the passage of the act aforesaid the new constitution of the state, known as the 'Constitution of 1875,' was adopted and ratified by the people of the state, and among other provisions of said constitution article 5 thereof contains the following section, viz.:

"'Sec. 10. The governor shall nominate and by and with the advice and consent of the senate (expressed by a majority of all the senators elected, voting by yeas and nays) appoint all officers whose offices are established by this constitution, or which may be created by law, and whose appointment or election is not otherwise by law or herein provided for; and no such officer shall be appointed or elected by the legislature.'

"Respondent further answering says that the portion of the act mentioned by relator which provided for the election of trustees by the legislature was by said section 10 of the constitution amended and repealed, and is not now, and was not at the date mentioned in relator's petition, of any force and effect, and all branches of the state government have so regarded and acted upon said statute. Respondent admits that the legislature elected trustees for said institution at the session when the act was passed, but alleges that the legislature has never made or attempted to make an election of trustees for said institution since, until the pretended election made in 1895, mentioned in relator's petition.

"Respondent further answering admits that the legislature done and performed the acts mentioned in relator's petition, but denies that said acts amounted to or constituted an election of relator and the other persons named to the office of trustees of said institution. Respondent alleges that said pretended election and all proceedings taken and had in and about the same by the legislature were contrary to the constitution and laws of the state and were null and void.

"Respondent further answering admits that relator and the other persons in his petition mentioned have pretended to qualify as trustees and have made a pretended election of relator as treasurer of said institution, as in relator's petition set out, but respondent alleges that all acts of said trustees are without color or authority of law and are null and void. Respondent further alleges that he as the chief executive of the state has full charge and control of said institution and has the sole right and authority to appoint the trustees and other officers for said institution.

"Respondent further answering alleges that among the provisions of the constitution of the state adopted in 1875 in article 2 thereof is a section in the following language, viz.:

"'Section 1. The powers of the government of this state are divided into three distinct departments, the legislative, executive, and judicial, and no person or collection of persons, being one of these departments, shall exercise any power properly belonging to either of the others except as hereinafter expressly directed or permitted.'

"Respondent alleges that the executive branch of the state government, either the board of public lands and buildings or the predecessors in office of respondent, have had the exclusive control and management of said institution for the blind ever since the adoption of said constitution, and respondent herein has sole right and authority to appoint trustees and other officers therefor.

"Further answering respondent admits that relator and the other persons mentioned in his petition claimed to act as trustees of said institution, but denies that they have possession and control of the same. Respondent further answering admits that relator has made and tendered to respondent a bond as mentioned in his petition, and that the same is in due form, and that the sureties thereon are good and sufficient, and that respondent has refused to approve the same. Wherefore respondent prays that relator's ap-

plication may be dismissed and that respondent may go hence and recover his costs."

There was no testimony adduced on behalf of either party, and the disposition of the controversy must be determined from a consideration of the issues and questions involved as raised and presented in the petition and answer. As stated in the pleadings filed by relator, there was passed, during a session of the legislature of 1875, an act establishing an institution for the blind and providing for the election of a board of trustees to manage the affairs of the institution. It was further provided in section 4 of the act referred to, as follows: "The trustees shall have the general supervision of the institution, adopt rules for the government thereof, provide teachers, servants, and necessaries for the institution, and perform all other acts necessary to render the institution efficient and to carry out the purposes of the establishment." It does not appear from the pleading when the first board of trustees was elected, but it is conceded by both parties in the argument in briefs filed, and is a fact, that the legislature which enacted the law, it being passed in such a manner as to take effect and be in force from and after its passage, and being approved February 19, 1875, elected a board, and this board assumed control of the institution and continued its management until the year 1877, when charge of its affairs was taken by what is known as the board of public lands and buildings. This board was created by section 19, article 5, of the "Constitution of 1875," which became the fundamental law of the state after the time of the passage of the act establishing the institution for the blind. The section referred to is as follows: "The commissioner of public lands and buildings, the secretary of state, treasurer, and attorney general shall form a board, which shall have general supervision and control of all the buildings, grounds, and lands of the state, the state prison, asylums, and all other institutions thereof, except those for

educational purposes; and shall perform such duties and be subject to such rules and regulations as may be prescribed by law." The powers and duties of this board were defined by an act of the legislature February 13, 1877. We will further state here that during the month of October, 1877, an opinion was rendered by this court in the case of the *State v. Bacon*, 6 Neb., 286, in which it was decided that the institution for the blind was not an educational institution and not within the exception of section 19, article 5, of the constitution, and was within the control of the board of public lands and buildings; but in an opinion filed January 2 of the current year it was determined by the court to be an educational institution within the meaning of the exception contained in section 19, article 5, of the constitution (*Curtis v. Allen*, 43 Neb., 184), and the legislature, on the 5th day of April of this year, elected a board of trustees for the institution for the blind as provided in the act of 1875, and on the 15th of the same month the persons so selected held a meeting at which the relator was chosen to fill the office of treasurer of the board of trustees and prepared and presented his bond as such officer to the respondent for approval, as admitted in the pleadings, with the result as therein stated.

It is insisted by the respondent that section 2 of the law of 1875, which created this board of trustees and provided the manner of its election, is in direct conflict with the constitution of 1875, which, as I have stated, became of force after the act in question was in effect, and that by the adoption of the constitution and its becoming the primary law of the state the portion of the act referred to was abrogated and repealed, and the office of member of the board of trustees was abolished, or the appointment to it vested in the governor. To support this contention counsel for the governor quote in their brief a number of sections of the constitution, some of which, it is claimed, have direct bearing upon the question at issue and others

are in point only as tending to disclose by their terms the
general policy or sentiment which prompted their incor-
poration in the instrument and its adoption, and it is urged
that they were of the same nature as the views and rea-
sons underlying the theory advanced by counsel for re-
spondent. The first of these sections of the constitution
which I will notice is section 1, article 2, which is as fol-
lows: "The powers of the government of this state are
divided into three distinct departments, the legislative, ex-
ecutive, and judicial, and no person or collection of per-
sons, being one of these departments, shall exercise any
power properly belonging to either of the others except as
hereinafter expressly directed or permitted." This section
merely states the departments or divisions of the state gov-
ernment. It does not define the powers and duties which
shall pertain to any division. This is left as a task to be
performed in other sections of the same instrument, and in
laws enacted in pursuance of its provisions. It is, how-
ever, well settled that "The difference between the depart-
ments undoubtedly is that the legislature makes, the ex-
ecutive executes, and the judiciary construes the law."
(Cooley, Constitutional Limitations, p. 108, and cases cited.)
Counsel for respondent insist that appointment to office is
distinctly within the purview of the executive division, or
is an executive function, and that when the people of the
state adopted the present constitution, they sought to estab-
lish this principle, or rule, and the court should give this
due weight in construing what is said in the constitution
in regard to offices and appointments thereto, and, so far
as possible, give it full scope and effect. In the brief of
respondent is the following quotation upon the subject of
appointment to office being peculiarly within the powers
of the executive: "Mr. Jefferson, in a letter to Samuel
Kercheval, dated July 12th, 1816, said: 'Nomination to
office is an executive function. To give it to the legisla-
ture, as we do [in Virginia], is a violation of the principle

State v. Holcomb.

of the separation of powers. It swerves the members from correctness by temptations to intrigue for offices themselves and to a corrupt barter of votes; and destroys responsibility by dividing it among a multitude.'" (Jefferson's Complete Works, vol. 7, p. 12.) And the view that nomination to office is an executive function, and intrinsically so, has been adopted by a number of the courts, while the contrary view has also been adopted by some, and in a dissenting opinion by Elliot, C. J., in the case of *State v. Hyde*, 22 N. E. Rep. [Ind.], on page 652, it is said: "Perhaps the principle has never been more clearly stated than by the great constitutional lawyer whose statements, as Emerson says, 'lay in daylight.' That lawyer said: 'The inferences which I think follow from those views of the subject are two: First, that the denomination of a department does not fix the limits of the power conferred on it, nor even their exact nature; and second (which, indeed, follows from the first), that in our American governments the chief executive magistrate does not necessarily, and by force of his general character of supreme executive, possess the appointing power. He may have it, or he may not, according to the particular provisions applicable to each case in the respective constitutions.' (Webster's speech on the presidental protest.)" From all of which it appears that there was not a unanimity of opinion upon the question among our ablest minds in the past, or the courts, or judges of the same courts. This court has said as to the division of power and the exercise of power properly belonging to one by the others: "The powers of the state government are divided into three distinct departments, the legislative, the executive, and judicial, and no person or collection of persons, being one of these departments, can exercise any power properly belonging to either of the others, except expressly so authorized by the constitution. Under this division of distinct departments of the government, the apportionment of power to one department will, of itself, imply an inhibi-

tion of its exercise by the others." (*Turner v. Althaus*, 6 Neb., 69.) If this court was also committed to the doctrine that appointment to office is essentially or exclusively considered in the abstract an executive function and our constitution stopped with the provision last quoted, the solution of the problem presented in this case would not be difficult. All power is inherent in the people. This statement is not new and contains nothing startling, but it is well that it be repeated and kept strongly in mind, and its exercise by those to whom it is delegated be directed toward furthering the best interests of the beneficiaries of the trust. In government this power is necessarily delegated by its primary possessors, portions of it to bodies of men, such as is the legislature in our own and sister states. Other portions more properly to one man, as our governor. This is usually done through the medium of what is known as a constitution, and history gives us many' accounts of struggles by the people to repress, abridge, and circumscribe a dangerous extension of delegated power, at times by an executive and at others by the legislative body. Some of the United States at the inception of their existence adopted constitutions in which the power to elect or appoint officers was lodged in the legislative department, and in constitutions adopted at a later date in their state life changed this and either made the offices mainly elective or gave their nomination to the executive. It is stated that the reason for this after or later action was that it had been discovered that the exercise of the elective or appointive power to office, generally, by the legislature was corrupting, dangerous, and injurious to the best interests of the states where it prevailed. In our state, under the provisions of the constitution in force prior to and at the time of the adoption of the present one and the construction given to the portions of the old constitution in relation to offices and appointment or election thereto, the legislature had and exercised such power, an instance of the right to

exercise the power being the passage of the law under
which the relator claims title to the office of trustee, and
its placing the selection of trustees in the legislature,
and of which, under the old constitution, no question
would or could have successfully been raised.   This shows
beyond a doubt that up to the time of the adoption of the
constitution of 1875 the doctrine that the power of ap-
pointment of officers was intrinsically an executive func-
tion or inherent in the executive department of our state
government was not prevalent and did not obtain to any
extent or in any degree.   In the new constitution the
draughtsman of the instrument, the convention which con-
sidered and arranged it for submission to the source of
power, the people, from whose approval it must derive vi-
tality and force, placed in it the section hereinbefore quoted
by which the departments of the state government were
clearly defined, and expressly prohibited the exercise of any
proper power of any one of them by either of the others,
and further, in section 10 of article 5, which is as follows:
" The governor shall nominate and by and with the advice
and consent of the senate (expressed by a majority of all
the senators elected, voting by yeas and nays) appoint all
officers whose offices are established by this constitution, or
which may be created by law, and whose appointment or
election is not otherwise by law or herein provided for;
and no such officer shall be appointed or elected by the
legislature,"—did not leave the duties of the chief execu-
tive officer in relation to appointment of officers to specu-
lation or conjecture or to be determined by construction,
but I think distinctly, and in unmistakable terms, defined
the duties of the chief executive in respect to the appoint-
ment of officers and the offices to which they should apply
and include, and here did not recognize the doctrine of the
intrinsic right of the executive to control nominations to
office, but excepted such as were otherwise provided for in
the instrument, or might be otherwise provided for by law,

and this must be presumed to have been intentionally done, for the framers of the constitution and the body which arranged it for submission were no doubt painstaking and careful and examined and weighed the words, phrases, and sentences of the sections and articles and debated their effect before allowing them to become constituents of the instrument.    Hence I conclude that the doctrine invoked by counsel for respondent, of the inherent right of the executive department to appoint officers, is not entitled to and should not be accorded any very great weight or further consideration in the determination of the questions herein involved.    I am not at this time called upon to define or prescribe generally the boundaries or limitations of the exact powers or duties of either the executive or legislative department, this being a subject upon which a particular direction is made in the constitution itself.

If the section of the law under which relator claims title to the office of trustee and treasurer of the board of trustees is clearly in conflict with the terms of the constitution, or any section or sections of it, or inconsistent therewith, then it was annulled and must be declared void, but not unless unmistakably so.    If there exists a doubt upon the subject it must be allowed to prevail in favor of the law.    "The repugnancy which must cause the law to fall must be necessary and obvious; if by any fair course of reasoning the law and the constitution can be reconciled, the law must stand." (*Cass v. Dillon*, 2 O. St., 608.)    It is provided in the constitution, which it is claimed abrogated this law, that all laws in force at the time of the adoption of this constitution not inconsistent therewith shall continue to be as valid as if this constitution had not been adopted.    The task then to be performed in the present controversy is to construe section 10, above quoted, according to the established rules of construction in such cases, one of which is to discover, as nearly as may be, the intention of the body which framed and submitted and also of the people who adopted

it; and another is that "its terms must be taken in the ordinary and common acceptation, because they are supposed to have been so understood by the framers and by the people who adopted it. This is unquestionably the correct rule of interpretation. It, unlike the acts of our legislature, owes its whole force and authority to its ratification by the people, and they judged it by the meaning apparent on its face, according to the general use of the words employed, when they do not appear to have been used in a legal or technical sense." (Sedgwick, Construction of Statutory & Constitutional Law, p. 413.) "The object of construction as applied to a written constitution is to give effect to the intent of the people in adopting it. * * * Possible or even probable meanings, when one is plainly declared in the instrument itself, the courts are not at liberty to search for elsewhere. 'Whether we are considering an agreement between parties, a statute, or a constitution, with a view to its interpretation, the thing which we are to seek is the thought which it expresses. To ascertain this, the first resort in all cases is to the natural signification of the words employed in the order of grammatical arrangement in which the framers of the instrument have placed them. If thus regarded the words embody a definite meaning, which involves no absurdity and no contradiction between different parts of the same writing, then that meaning apparent on the face of the instrument is the one which alone we are at liberty to say was intended to be conveyed. In such a case there is no room for construction. That which the words declare is the meaning of the instrument, and neither courts nor legislatures have a right to add to or take away from that meaning.' * * * In interpreting clauses we must presume that the words have been employed in their natural and ordinary meaning. As Marshall, C. J., says: the framers of the constitution and the people who adopted it 'must be understood to have employed words in their natural sense and to have intended

what they have said.'" (Cooley, Constitutional Limitations, pp. 69–73.) And POST, J., in *Curtin v. Atkinson*, 36 Neb., 115, says: "One of the most familiar rules of construction is that words are to be taken in their ordinary grammatical sense, unless such a construction would be obviously repugnant to the framers of the instrument, or would lead to some other inconvenience or absurdity. (Sedgwick, Construction of Statutory & Constitutional Law [2d ed.], p. 220.)" Bearing these rules and directions in mind, I will now attempt to ascertain the meaning of section 10, article 5, the one by which the appointive power as to offices is conferred upon the governor and a limitation or prohibition in that respect placed upon the legislative powers. This section provides that the appointing power as to the two classes of officers shall be in the governor: First, "all officers whose offices are established by this constitution;" second, "or which may be created by law." This second class, giving to the words describing the officers included in it their ordinary acceptation or meaning, clearly included only the officers whose offices may be created or brought into being or existence by law in the future, not what had or then existed, and the offices of trustees, having been created in 1875 and prior to the adoption of the constitution, were not included in either class of offices referred to in section 10, and to be filled by appointment by the governor. The clause, "and no such officer shall be appointed or elected by the legislature," clearly refers to any and all officers covered by the section in which it is contained, and not to any offices or officers not included in the section. The propriety or policy of placing this inhibition upon the powers of the legislature to fill by appointment or election any of the offices referred to I need not comment upon or discuss, nor whether or not it should have included some which are not within the plain and ordinary meaning of its terms and by construction read them in. I am not seeking now to ascertain what should

State v. Holcomb.

or ought to have been the constitutional provisions in this particular, but what, from the import of the words or language employed, is it, or does it provide. If the makers of the constitution had desired to make the foregoing inhibition apply to all officers, apt terms could and would have been employed to make certain their intention, and this is just as true of the words and phrases used in conferring the appointive power to the extent they did, upon the governor. If it had been their intention to cover the office claimed by relator, language could and would have been used which would have effected the purpose and not left it to be done, if at all, by the aid of a doubtful and uncertain construction.

I have examined the cases cited by respondent, among them those in the 66 N. Car., 59, and 68 N. Car., 429, 520, and another case in the same report, page 457, on the same subject, the North Carolina cases all being in part in relation to the construction of a section of the constitution of that state treating of appointment of officers and in whom shall be lodged the appointive power. The section of the constitution of North Carolina referred to is as follows: "The governor shall nominate and by and with the advice and consent of a majority of the senators elect, appoint all officers whose offices are established by this constitution or which shall be created by law, and whose appointments are not otherwise provided for; and no such officer shall be appointed or elected by the general assembly." In construing this section the North Carolina court states that "the words 'whose appointments are not otherwise provided for'" evidently meant provided for by the constitution, thus eliminating from the section any question of the appointment or election of any officer or officers being provided for by law, and making the section of the constitution under consideration, and construed in the cases cited, radically different from the corresponding section of our constitution in respect to the appointment of officers by the chief executive

of the state, and the above construction of the portion of the section of the constitution of North Carolina naturally follows from, and is largely founded upon and induced by, the proposition that the appointive power as to officers is strictly an executive function, and that it was the intention of the framers of the North Carolina constitution and of those who adopted it, that since to the governor it most properly belongs, to him it should be given, and that to the exclusion of all others, unless in the same instrument which conferred such power upon him an exception as to any officer or officers was clearly expressed and provided, while in our fundamental law, in the portion in which the governor is vested with the appointive power as to certain officers, it is stated in clear and unmistakable terms that officers of the classes therein specified whose appointment or election is not otherwise by law or in the constitution provided for, he shall make the appointments, undoubtedly excepting officers for whose appointment or election the legislature, the department of state government nearest the people, shall prescribe by law other methods, or lodge the power in a person or persons other than the governor, clearly indicating that it was not the idea of the framers of our constitution, or the people by whom it was adopted, that the power to appoint officers was exclusively an executive function. The foregoing are some of the thoughts and reasons which lead me to conclude that the cases cited need not be considered as decisive of the points in controversy in the case at bar, and hence I do not feel constrained to follow the doctrine and rules announced in them.

Counsel for respondent, in a very forcible manner, invoke the rule of what is denominated "contemporaneous construction,"—the construction placed upon the constitution by one or more co-ordinate departments of the state government at the time of its taking effect as the primary law of the state, and claim that by the changes

which occurred at or near the same time in the affairs of
the institution for the blind and the management thereof
it was manifestly evidenced that it was considered by those
interested and the departments of state concerned that the
constitutional provisions in relation to offices and officers
had destroyed the force of the provisions of the prior law
of 1875 in respect to the officers of such institution and
the source of their appointment and election. I have no
desire to run counter to or conflict with what is known as
the rule of contemporaneous construction, or to deny the
rule its full force and significance, but my understanding
is that where the text of the article or section to be con-
strued is so worded as not to be doubtful or ambiguous in
meaning, but is clear and distinct, the meaning apparent
and conveyed by the words themselves, the doctrine of con-
temporaneous construction is not applicable and need not be
invoked, but the intent and meaning to be gathered from
the article or section itself must prevail. It has been said:
"But where there has been a practical construction which
has been aquiesced in for a considerable period, considera-
tions in favor of adhering to this construction sometimes
present themselves to the courts with a plausibility and
force which it is not easy to resist. Indeed, where a par-
ticular construction has been generally accepted as correct,
and especially when this has occurred contemporaneously
with the adoption of the constitution, and by those who
had opportunity to understand the intention of the instru-
ment, it is not to be denied that a strong presumption exists
that the construction rightly interprets the intention. * *
Where, however, no ambiguity or doubt appears in the
law, we think the same rule obtains here as in other cases,
that the court should confine its attention to the law, and
not allow extrinsic circumstances to introduce a difficulty
where the language is plain. To allow force to a prac-
tical construction in such a case would be to suffer mani-
fest perversions to defeat the evident purpose of the law

makers. 'Contemporary construction can never abrogate the text; it can never fritter away its obvious sense; it can never narrow down its true limitations; it can never enlarge its natural boundaries.'" (Cooley, Constitutional Limitations, 82, 84.) Believing as I do, that the true intention of the section of the constitution under consideration is clearly shown in its own text, I need not go further or resort to rules for its construction. When we further recall and consider the judicial construction which was made of the provisions of the constitution of 1875, in reference to offices and appointment thereto, and their bearing upon those of the institution for the blind, very closely following the establishment of the constitution of 1875, and the subsequent judicial construction of the same constitutional provisions, and in relation to the same institution and its affairs, and the changes consequent upon the later judicial construction, and the legislative action or election of trustees which followed, it destroys much of the weight which might be given to any contemporaneous construction, conceding that it is shown in the history of the institution in question to have occurred, and I do not think it of sufficient force to control the disposition of the points discussed or to establish that the law of 1875, in so much as it referred to officers of the institution for the blind and the manner of their election, is in conflict with the provisions of the constitution of 1875 or inconsistent therewith.

Another contention of the respondent is that section 26 of article 5, which is as follows: "No other executive state office shall be continued or created, and the duties now devolving upon officers not provided for by this constitution shall be performed by the officers herein created,"—is applicable and includes the trustees provided for in section 2 of the act of 1875, and that the last mentioned section is in direct conflict with the section of the constitution just quoted. With this I cannot agree. The officers referred to in section 26 of the constitution are the executive state

officers proper, and may probably be confined to those enumerated and denominated in the portion of the constitution which is devoted to defining the executive department of the state government and its officers, their powers and duties. It was said in regard to this section in connection with section 1 of the same article in the opinion in the case of *State v. Weston*, 4 Neb., 234: "It was claimed on behalf of the defendant that the office ceased to exist on the first day of November last, when the new constitution took effect. This claim is based upon sections 1 and 26, article 5, of the constitution. Section 1, among other things, provides that 'the executive department shall consist of a governor, lieutenant governor, secretary of state, auditor of public accounts, treasurer, superintendent of public instruction, attorney general, and commissioner of public lands and buildings;' and section 26, 'that no other executive state office shall be continued or created, and the duties devolving upon officers not provided for by this constitution shall be performed by the officers herein created.' This last section doubtless refers solely to executive state officers and to civil duties strictly executive." In this article of the constitution a distinction is drawn between the officers who may be styled strictly executive officers of the state and such officers as the trustees of the institution for the blind. Thus, in section 21 it is stated: "An account shall be kept by the officers of the executive department and of all the public institutions of the state," and again in section 22, "The officers of the executive department and of all the public institutions of the state shall, at least ten days preceding each regular session of the legislature, severally report to the governor, who shall transmit such reports to the legislature, together with the reports of the judges of the supreme court of defects in the constitution and laws, and the governor or either house of the legislature may at any time require information, in writing, under oath, from the officers of the executive department, and all officers and managers of

state institutions, upon any subject relating to the condition, management, and expenses of their respective offices." I have noticed the sections of the constitution referred to by counsel for respondent and have read and construed the section more especially under consideration in connection with them and in connection with such other clauses or sections of the constitution as might have a bearing upon or affect its meaning, and, in conformity to the views hereinbefore expressed, conclude that the sections of the act of 1875 under which the relator was elected trustee of the institution for the blind and treasurer of the board of trustees, and by virtue of which he executed and presented his bond to the governor for approval, were not in conflict with the provisions of the constitution of 1875 or inconsistent therewith.

In the brief filed for respondent appears the following statement: "The right of this court to issue a writ of *mandamus*, in this or any other case, to require the respondent, as chief executive, to perform any duty of his office, or to in any matter control his discretion, is not conceded, * * but, in accordance with the agreement entered into between the relator and this respondent before the honorable judges of this court, that the entire matter of the validity of the election of the relator as treasurer, and of the election of the board of trustees of the institution, should be submitted to the court in this cause for a decision upon the merits, the respondent will not, and does not, raise nor insist upon such objection, but expressly waives any objections upon that ground." Since the point of objection suggested in the above quotation is not raised nor insisted upon, but is expressly waived, it requires no discussion.

IRVINE, RAGAN, and RYAN, CC., concur in the foregoing dissenting opinion.